Filed 3/28/24  P. v. Dixon CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B325051 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA469610) |
| v. | |
| BRANDON J. DIXON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  H. Clay Jacke, II, Judge.  Affirmed with directions.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Brandon J. Dixon aided and abetted two accomplices who shot at a group of five people, killing one and seriously wounding another. Defendant appeals from his conviction by jury of one count of first degree murder, four counts of premeditated attempted murder and one count of shooting at an occupied vehicle. He contends the verdicts are not supported by substantial evidence and that the court's instructions to the jury on murder and attempted murder were infirm. He further contends the record does not show the court understood the scope of its discretion in imposing the firearm enhancements. Defendant also requests correction of his presentence custody credits.

We direct the superior court to correct the presentence custody credits on remand and otherwise affirm the judgment of conviction in its entirety.

## FACTUAL AND PROCEDURAL SUMMARY

### 1. The Charges

Defendant was charged with one count of murder (Pen. Code, § 187, subd. (a); count 1), four counts of premeditated attempted murder (§§ 187, subd. (a), 664; counts 2–5), and one count of shooting at an occupied vehicle (§ 246; count 6). As to all counts, it was alleged the crimes were gang related and that a principal personally used and discharged a firearm causing great bodily injury (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b)–(e)(1)). It was also alleged defendant had suffered two prior convictions for serious felonies (§§ 667, subd. (d), 1170.12, subd. (b)).

### 2. Background

The Rolling 40's Neighborhood Crips and the Rolling 60's Neighborhood Crips are affiliated criminal street gangs with territories that border one another in south Los Angeles. Starting in 2014, the two gangs, although technically aligned, often feuded

with each other, stemming from a dispute about a homicide that occurred that year.

Defendant is a Rolling 60's gang member. In the months leading up to the shooting in this case on July 1, 2018, defendant had regular contact, both in person and by phone, with two other Rolling 60's gang members, Omario Guerrero and Dejone Wright, both of whom were several years younger than defendant. Guerrero was a minor. (Charges against Guerrero and Wright were resolved separately before trial via plea agreements.) Photographs of defendant, Guerrero and Wright flashing Rolling 60's hand signs, along with other active members of the gang, were shown to the jury.

Garry Dorton, a former Rolling 40's gang member and the murder victim in this case, was a community gang intervention worker for a nonprofit organization that worked with the City of Los Angeles Mayor's Office Gang Reduction & Youth Development program. Mr. Dorton's work involved outreach to community members and gang members following gang-related incidents, mentoring youths, and organizing and participating in "peace-keeping events" such as baseball and softball games between gang members. On July 1, 2018, Mr. Dorton was at Peck Park in San Pedro where such a baseball game was being played.

T.M. was at the park that day watching the game with a friend. (We refer to witnesses only by their first names or initials to protect their privacy.) A loud "commotion" arose behind where T.M. and her friend were seated in beach chairs. A group of 15 to 40 men were in the parking lot yelling at each other. T.M. testified they were "dark skin[ned]," but she was too far away to be certain of the race or age of any of the men involved in the disturbance. Because there were little kids in the park, T.M. decided to call 911, and then

3

she and her friend left.  The audio recording of her 911 call was played for the jury.

Officer Cristian Portillo of the Los Angeles Police Department (LAPD) was on patrol with his training officer that afternoon. Sometime around 5:00 p.m., they received a radio call about a disturbance at Peck Park.  They arrived at the park within a few minutes but did not see anything unusual going on at that time.

## 3.    The Crimes

Around 7 o'clock that same evening, Kevin P. arrived at the home of his friend F.J., who lived in the 4500 block of Van Ness Avenue–an area controlled by the Rolling 40's gang.  The home was known as a location where Rolling 40's gang members went to socialize, drink and gamble.  Kevin used to live in the neighborhood and remained friends with F.J. and his adult son T.J.

When Kevin arrived at F.J.'s home, he encountered Mr. Dorton (the community gang intervention worker who is the murder victim in this case) in front of the house and spoke with him for about five minutes before he went inside.  Kevin had been Mr. Dorton's neighbor for 22 years.  Mr. Dorton's truck was parked in the driveway, and there were two women seated in the truck whom Kevin did not know, one seated in the front passenger seat and the other in the back seat.  Kevin came back outside to talk with Mr. Dorton and T.J., who were standing close together on the passenger side of Mr. Dorton's truck.  Kevin leaned back against a nearby palm tree with his back to the street as he talked with Mr. Dorton and T.J.

Kevin was startled by the sound of multiple gunshots.  He ran towards F.J.'s front door.  Kevin was hit by multiple bullets in his stomach and neck.  From inside the house, F.J. also heard "multiple" shots and immediately opened the door to see what was going on.  He saw two men in the street, about four to five feet

4

apart, shooting at Mr. Dorton's truck, as Mr. Dorton stood by the passenger side of the truck.  After the shooting stopped, F.J. helped Kevin inside his home while T.J. called the police.  Kevin eventually underwent multiple surgeries to repair the damage from the multiple gunshot wounds.  Kevin testified he did not see the driver or the shooters because he had not been facing toward the street.  T.J. denied seeing what had happened, but admitted he called 911.

Three other witnesses testified about what they saw or heard regarding the shooting.  Florinda B. was driving home from work on Van Ness Avenue.  A small black car ahead of her came to an unexpected stop in the middle of the road.  Two males jumped out and headed toward the sidewalk.  Florinda drove around the black car.  She did not look at the driver of the car.  She then heard several loud noises she assumed were fireworks since it was almost the Fourth of July.   Video footage recovered from security cameras on the street showed her van driving past a black Mazda.

Danny B. was working in his front yard when a dark-colored car "zoom[ed]" down the street and stopped "abruptly" near F.J.'s home.  Two men immediately jumped out of the car, both holding handguns.  They ran "towards the group of men" in the driveway and fired multiple shots.  Danny saw muzzle flash from both guns and estimated he heard at least 15 shots.  The two men then ran back to the car, and it sped off.  Danny testified he did not see the face of either shooter and did not see the driver of the car.  The police recovered the video footage from the security camera on the front of Danny's home which captured the shooting.  Portions of the video were played for the jury.

Rodrigo M. was watching television when he heard "several" popping sounds he thought were fireworks.  He went to his front door and opened it.  He saw two people in the street in front of F.J.'s home with their arms outstretched.  Both of them had guns and

were shooting toward a truck parked in F.J.'s driveway. Rodrigo immediately closed his door and stayed inside until after the police arrived. He was not able to identify the driver of the car or the shooters.

LAPD Officer Richard Oke and his partner were the first to arrive on the scene. Officer Oke saw Mr. Dorton on the ground, next to the passenger side of his truck. He appeared to be dead from gunshot wounds. Officer Oke went inside the home and spoke with Kevin, who was bleeding but alive. Portions of Officer Oke's body camera footage were played for the jury. An autopsy later confirmed that Mr. Dorton died from a fatal gunshot wound.

4.    **The Investigation**

LAPD Homicide Detective Clifton Rose was assigned to investigate the shooting incident and murder of Mr. Dorton. Detective Rose was aware of the feud between Rolling 40's and Rolling 60's gang members that had been ongoing for several years. He learned that defendant was a Rolling 60's gang member who was on parole, and that one of the conditions of his parole required him to wear an ankle monitoring device with GPS tracking. Detective Rose discovered that defendant's ankle monitor showed he was at the scene of the shooting and had also been at Peck Park earlier in the day, sometime after 5:00 p.m.

Video footage from security cameras and nearby traffic cameras showed the shooters arrived on Van Ness Avenue in a black Mazda with a white Uber sticker on the windshield and a Nevada license plate. Detective Rose discovered the Mazda was a rental car. The agency that owned the car reported that it had not been returned and considered it stolen.

The police went to defendant's home on West 133rd Street looking for the black Mazda. When they arrived, they did not see the Mazda, but there was a red Kia parked in front with a female in

the driver's seat. A male passenger was seated in the back. The officers could not identify either individual as they drove by.

Shortly thereafter, the officers drove to a duplex in the 3200 block of West 59th Street. The duplex was a known hangout or "stronghold" for the Rolling 60's gang. The prosecution's gang expert testified that members used the location as a safe place to socialize, to plan criminal activities, and to store cars and weapons.

When the officers drove past the duplex, they saw the same red Kia parked out front that they had seen at defendant's house less than an hour before. The same female was in the driver's seat, and they saw a male passenger in the back seat, whom they observed was wearing a baseball hat.

The red Kia started to drive off. The officers were driving in the opposite direction, so they had to turn around to follow the Kia. By the time they caught up with the red Kia, the male passenger was no longer in the car. When the driver failed to signal before turning, the officers pulled the car over. During the traffic stop, they saw a white Uber sticker on the floorboard of the car and a key fob in the backseat. The key fob was later identified as the keys for the black Mazda.

That same day, the police located the black Mazda parked on West 59th Street a short distance away from the Rolling 60's stronghold.

Video footage from security and traffic cameras, analysis of cell phone and cell tower records, and the GPS tracking information for defendant's ankle monitor showed his movements on July 1, 2018. Early in the afternoon, defendant drove the black Mazda to a carwash and met up with one of the accomplices in the shootings, Guerrero, who was wearing distinctive red pants with a white stripe down the side. They hung out together at the carwash for

about an hour.  Defendant then drove the Mazda back to his home on West 133rd Street.

Meanwhile, Guerrero and the other accomplice, Wright, went to a shopping mall a short distance away.  The video footage recovered from security cameras showed them in clothing that was consistent with the clothing worn by the shooters depicted in the video footage of the shooting (Guerrero in the red pants and Wright in acid washed jeans).

Around 5:00 p.m., defendant went to a gas station and then drove to Peck Park, lingering in the parking lot area for about 10 minutes before making a stop at a liquor store and eventually going to the Rolling 60's stronghold on West 59th Street around 6:20 p.m.  Defendant remained at the gang stronghold until around 7:15 p.m.  Cell phone records showed that Guerrero and Wright were also at the stronghold during this time period.

The GPS records showed defendant then left the stronghold and travelled into Rolling 40's territory, arriving at F.J.'s house on Van Ness just before 7:30 p.m.  Video footage showed the black Mazda driving past F.J.'s home, circling around the block and then returning and stopping in front of F.J.'s home.  Two individuals jumped out of the Mazda wearing hoodies over their heads and the same distinctive clothing Guerrero and Wright were wearing earlier in the day.  Both individuals had their arms outstretched in a shooting position.  After the shooters ran back to the Mazda and jumped in, the Mazda sped off.  Defendant's GPS monitor showed that he travelled back to Rolling 60's territory and returned to the gang stronghold on West 59th Street.

The hood of Mr. Dorton's truck sustained damage consistent with ricochet impacts from bullets.  A bullet path analysis was performed and indicated the bullets that likely left those impact

8

marks were fired from the back driver's side of the truck toward the front passenger side.

LAPD Sergeant Jaime Avila testified as the prosecution's gang expert. He explained that gang members often used stolen cars to commit crimes and then abandoned them afterward because they were not easily traced back to them. Gang members were also well aware of the prevalence of security cameras and routinely covered their heads or faces when committing crimes. He explained that gang culture is based on earning and maintaining respect, and that acts of disrespect, even a verbal argument, could lead to retaliation against a rival gang member or the gang in general, and an escalation in violent conduct. Retaliation could be, and often was, exacted by other members of the gang and not necessarily by the individual who was disrespected. Sergeant Avila said that younger gang members, particularly minors, were often assigned to carry out shootings because gang members know that minors often receive shorter prison sentences than adults.

**5. The Verdict and Sentencing**

The jury found defendant guilty of first degree murder for the fatal shooting of Mr. Dorton, shooting at an occupied motor vehicle, and four counts of premeditated attempted murder for the shots fired at Kevin, T.J. and the two women in Mr. Dorton's truck.

In a bifurcated proceeding, the jury found true, as to all six counts, that the crimes were gang related within the meaning of Penal Code section 186.22, subdivision (b)(1)(C), and that a principal discharged a firearm causing great bodily injury within the meaning of section 12022.53, subdivisions (d) and (e)(1). The jury also found true the allegation that defendant had suffered two prior serious felonies in 2014 and 2015 (burglary and attempted burglary). The court granted defendant's oral motion to strike both of his prior strike convictions in the interests of justice.

9

The court sentenced defendant to a life term plus 75 years to life, calculated as follows: 25 years to life on count 1, plus a consecutive life term on count 2 (minimum parole eligibility of seven years), plus consecutive firearm enhancements of 25 years to life on each of counts 1 and 2. The court imposed concurrent sentences on counts 3, 4 and 5 and imposed and stayed sentence on count 6. The court orally awarded 1,095 actual days of presentence custody credits. The abstract of judgment reflects an award of 1,460 days.

This appeal followed.

## DISCUSSION

### 1.    Murder (Count 1)

Defendant contends his conviction for the murder of Mr. Dorton must be reversed due to instructional error and a lack of substantial evidence. He says the circumstantial evidence, viewed in conjunction with the jury instructions, allowed the jury to find him guilty of Mr. Dorton's murder by imputing the malice of the two shooters to him without concluding he personally harbored malice, contrary to the changes to murder liability effected by Senate Bill No. 1437 (2017-2018 Reg. Sess.). We disagree.

#### a.    The jury instructions

We review a claim of instructional error de novo, independently assessing the wording of any challenged instruction and determining whether it accurately states the law. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We "must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution." (*Ibid*.) Jury instructions are not viewed in isolation but " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid*.)

10

Here, the jury was given instructions that accurately stated the current law of liability for aiding and abetting a murder. CALJIC No. 3.01 told the jury that a person is liable as an aider and abettor when "[w]ith knowledge of the unlawful purpose of the perpetrator" and, with the intent of encouraging or facilitating the commission of that crime, the person aids, promotes or encourages the commission of that crime.

The jury was also correctly instructed on the elements of murder, the definition of malice, and first and second degree murder. As relevant here, CALJIC No. 8.10 told the jury that a finding of murder required the unlawful killing of another with malice aforethought. CALJIC No. 8.11 informed them that malice may be express or implied and express malice required a specific intent to kill. CALJIC No. 8.20 instructed that a finding of premeditated first degree murder required express malice.

Collectively, these instructions informed the jury that in order to convict defendant of first degree murder as an aider and abettor, it would have to find he had the specific intent to kill, he knew of his accomplices' intent to kill, and he aided and encouraged the murder of Mr. Dorton. There was no error in instructing the jury as to the requisite intent to kill.

Moreover, the prosecutor did not proffer any theory of implied malice or imputed malice, or that defendant and the shooters acted only with a conscious disregard for human life, or that defendant could be guilty of murder even if he only intended to aid and abet some other act like assault. Defendant concedes he was prosecuted on the sole theory that he directly aided and abetted the shooters. Defendant has not shown there was any ambiguity or confusion created by the jury instructions that would have allowed a reasonable jury to misapply the law and find him guilty on an implied malice theory.

Defendant's reliance on *People v. Langi* (2022) 73 Cal.App.5th 972 and *People v. Maldonado* (2023) 87 Cal.App.5th 1257 (*Maldonado*) in arguing that the instructions were ambiguous and allowed that possibility is misplaced. *Langi* concluded that the standard aiding-and-abetting instructions are "ill suited" to the crime of second degree murder. (*Langi,* at p. 982.) Nothing in *Langi*'s analysis of the instructions on aiding and abetting applies to a first degree murder committed with intent to kill.

*Maldonado* involved first degree murder but it also has no application here. The defendant there appealed from the denial of a resentencing petition pursuant to Penal Code section 1172.6. (*Maldonado, supra,* 87 Cal.App.5th at p. 1259.) The court reversed and remanded for an evidentiary hearing because it could not say unequivocally that the jury had not been misled by the jury instructions. (*Id.* at p. 1269.) The court explained that the jury had been presented with a lying-in-wait murder theory and lying-in-wait instructions, and "first degree lying-in-wait murder can be based on a theory that the perpetrator acted with implied malice rather than an intent to kill." (*Id.* at p. 1267.) The jury here was not presented with any similar option.

### b.    The evidence

We review the evidence according to the familiar standard. (*People v. Clark* (2011) 52 Cal.4th 856, 942–943 [reviewing court considers the whole record in the light most favorable to the judgment to determine if it contains evidence, both direct and circumstantial, that is reasonable, credible and of solid value, sufficient to support a finding of guilt beyond a reasonable doubt; the court presumes in support of the judgment the existence of all facts and inferences the trier of fact could reasonably deduce from the evidence].)

Defendant concedes, as he did in the trial court, that the GPS evidence from his ankle monitor showed he was "in the area" of the murder. But he contends the balance of the evidence did not establish he drove the Mazda to the scene or that he was anything other than a passenger in the vehicle who had no knowledge of a planned shooting or any intent to kill. He says the prosecution's theory of his role in the shooting rests on speculation arising from the evidence that he was driving the Mazda earlier in the day. Defendant's argument disregards much of the evidence and the reasonable inferences therefrom on which the jury was entitled to rely in finding him guilty of murder.

Numerous factors may be considered in assessing aiding and abetting liability, including " 'presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) Evidence of motive is another relevant factor. (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599.)

There was substantial evidence of all of these factors. There was evidence of an ongoing feud between the Rolling 60's and Rolling 40's gangs. Defendant and the shooters were active Rolling 60's gang members, and Mr. Dorton was a former Rolling 40's gang member. The GPS evidence, the cell phone and cell tower records, and the video footage from multiple security cameras and traffic cameras established that defendant was driving the stolen Mazda throughout the day and was meeting and talking in person and over his cell phone with his accomplices, Guerrero and Wright, including at the Rolling 60's hangout on West 59th Street immediately before and after the shooting.

This evidence, along with the testimony of the gang expert, reasonably supported the conclusion that defendant, Guerrero and Wright met up at the gang's stronghold to plan an attack, then

13

drove together into Rolling 40's territory to a home that was a known Rolling 40's hangout. They drove past the home and saw three potential victims standing together in the driveway next to a truck with two other victims seated inside, then went around the block and returned to shoot and kill their intended targets as part of the long-running feud between the two gangs and in likely retaliation for the earlier skirmish at Peck Park.

The nature of the attack also supported the conclusion it was a planned, premeditated attack and not one that Guerrero and Wright simply decided to undertake spontaneously on their own, unbeknownst to defendant. That there was no evidence that any of the defendants expressly voiced an intent to kill Mr. Dorton does not diminish the substantial circumstantial evidence of intent. " 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*Nguyen*, *supra*, 61 Cal.4th at p. 1055.)

**2.  Attempted Murder (Counts 2–5)**

Defendant argues all four attempted murder convictions also must be reversed because of a lack of substantial evidence and a failure of the jury instructions to clearly instruct that defendant, as an aider and abettor, had to personally harbor an intent to kill as to each attempted murder victim. We disagree.

"To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*People v. Bland* (2002) 28 Cal.4th 313, 328; accord, *People v. Souza* (2012) 54 Cal.4th 90, 120 [doctrine of transferred intent "does not apply to attempted

14

murder.  'To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.' "].)

As explained above, the court's instruction on aiding and abetting accurately stated the law.  The jurors were instructed on the elements of attempted murder with CALJIC No. 8.66 which told them that attempted murder requires "[a] direct but ineffectual act . . . by one person towards killing another human being" and the person committing the act must harbor express malice "namely, a specific intent to kill."  Combined with CALJIC No. 3.01, the instructions adequately informed the jury that the perpetrator of the attempted murder, and anyone who aided the perpetrator, must have acted with a specific intent to kill.  Moreover, the jurors were instructed with CALJIC No. 17.02 which told them that each count is a distinct crime and "You must decide each Count separately."

The evidence discussed above in connection with the murder of Mr. Dorton also constitutes substantial evidence of defendant's guilt as an aider and abettor for the attempted murders of Kevin, T.J. and the two female victims.

Defendant says there was insufficient evidence for the jury to reasonably conclude beyond a reasonable doubt that the two female victims were visible to defendant and the shooters and were targets of the shooting.  Defendant says Kevin's testimony is improbable and should be disregarded because he testified he was not looking in the direction of the street or truck at the time of the shooting. We disagree.  Kevin was not looking in the direction of the street or shooters when the gunfire erupted, but that does not make improbable his testimony that Mr. Dorton arrived with two female passengers a half hour before the shooting and that they remained in the truck during Kevin's conversations with Mr. Dorton before and at the time of the shooting.  (*People v. Truong* (2017) 10 Cal.App.5th 551, 556 [testimony of a single witness is sufficient to

15

support a conviction, unless it is physically impossible or inherently improbable].)

Moreover, there was no evidence the women in the truck were not visible to defendant and the shooters. Defendant made an initial pass around the block, then returned to park near the truck, when the shooters got out and fired in close proximity to the truck. There was no evidence of any obstructions between them and the truck, nor evidence it was dark outside at the time. Indeed, Kevin testified that when he arrived around 7:00 p.m., it was still light outside given that it was a summer evening. And, the bullet path analysis was strong circumstantial evidence of an intent to kill and shooting at an occupied vehicle. The same evidence that supports the murder and the other two attempted murders supports these two attempted murder charges. Defendant is asking us to reweigh the evidence and draw contrary inferences, which we cannot do. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

## 3. Shooting at an Occupied Vehicle (Count 6)

Defendant contends count 6 also fails for lack of substantial evidence. He reiterates his argument there was no evidence to support a jury finding that he and the shooters were aware there were two people sitting in Mr. Dorton's truck. The contention is without merit. The same evidence that supports the attempted murder charges constitutes substantial evidence supporting defendant's conviction as an aider and abettor of shooting at an occupied vehicle.

## 4. The Firearm Enhancements

Defendant contends the record does not reflect the trial court understood the scope of its authority with respect to imposing the fire enhancements pursuant to Penal Code section 12022.53. He requests the 25-year firearm enhancements be stricken on counts 3 through 6 as to the victims who were not physically injured. He

16

also requests remand for resentencing on counts 1 and 2 to allow the court the opportunity to consider imposition of a lesser term firearm enhancement on those two counts in accordance with *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*).

We review a trial court's order denying a motion to strike or dismiss a sentencing enhancement under the deferential abuse of discretion standard. (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 490; *People v. Carmony* (2004) 33 Cal.4th 367, 373–374 [order denying motion to strike prior conviction allegation reviewed for abuse].) We find no abuse of discretion.

Penal Code section 12022.53 specifies separate enhancement terms based on the type and nature of firearm use during the commission of an enumerated felony: a 10-year term for personal use of a firearm (§ 12022.53, subd. (b)); a 20-year term for personal and intentional discharge (§ 12022.53, subd. (c)); and a 25-year-to-life term for personally and intentionally discharging a firearm that causes great bodily injury or death to "a person" other than an accomplice (§ 12022.53, subd. (d)). Subdivision (e)(1) imposes vicarious liability on aiders and abettors for the qualifying acts of any principal in a gang-related offense. Here, the jury's true findings as to all counts were based only on subdivisions (d) and (e)(1).

Penal Code section 12022.53, subdivision (h) grants the sentencing court the discretion to strike or dismiss an enhancement in the interest of justice pursuant to section 1385. Almost six months *before* the sentencing hearing in this matter, *Tirado* held that a sentencing court has not only the authority to strike or dismiss an enhancement under section 12022.53 as reflected in subdivision (h), but the discretion to impose one of the lesser terms, even if those lesser terms were not charged. (*Tirado, supra,* 12 Cal.5th at pp. 692, 700.)

17

"In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.'" (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) The record here does not contain evidence demonstrating the court was unaware of its authority under *Tirado*, a decision which had been in effect for almost half a year.

Defendant says it was "clear" the court's intent was for him to receive a fair sentence that was not grossly disproportionate to the determinate terms given to the shooters in plea agreements with the prosecutor. The record does show that the court exercised its discretion not to impose a maximum sentence, but nothing in the record makes it clear the court was unaware it had the authority to reduce defendant's sentence further.

At the outset of the hearing, the court exercised its sentencing discretion to grant defendant's motion to strike his two prior strike convictions, finding it was in the interests of justice to do so and explaining that a nonstrike sentence would still be "substantial." The court said it believed a sentence involving strikes would be "unjust" given the facts and circumstances of the case and defendant's role in it.

The court then imposed the 25-year enhancements as to both counts 1 and 2 involving the murder of Mr. Dorton and the multiple gunshot wounds to Kevin P. The court acknowledged it had been asked to exercise its discretion to strike the enhancements and said it saw "no reason to." The court said it could not excuse what defendant did.

As to the three attempted murder counts with victims who were not physically injured (counts 3–5), the court imposed the 25-year enhancement on each count but exercised its discretion to run all of those sentences concurrently, on both the substantive offenses

and the enhancements. On count 6, the court imposed and stayed sentence pursuant to Penal Code section 654.

The court chose to exercise its discretion by striking the prior strikes and imposing concurrent sentences on counts 3 through 5 and staying the sentence on count 6. This does not reflect an arbitrary or abusive exercise of discretion, nor does it show that the court did not know it could have imposed lesser firearm enhancements had it wished to reduce defendant's sentence further.

Finally, defendant references a comment by the court during its discussion with counsel about the verdict forms for the attempted murder counts. The court said that if the jury comes back with a true finding that is "inconsistent" with the law, the court would strike it and that defendant would not be "punished for something he could not be."

The jury's true findings were not inconsistent with the law, and the 25-year firearm enhancements pursuant to Penal Code section 12022.53, subdivision (d) were lawfully imposed. In *People v. Oates* (2004) 32 Cal.4th 1048 (*Oates*), the Supreme Court interpreted the language of section 12022.53, subdivision (d). The defendant in *Oates* fired two shots at a group of five people, injuring just one. (*Oates,* at p. 1052.) The defendant was convicted of five counts of attempted murder and the trial court imposed subdivision (d) enhancements as to each of the five counts. (*Ibid*.) The Supreme Court concluded the trial court did not err in doing so. (*Id*. at pp. 1052–1053.)

*Oates* explained that the 25-year section 12022.53, subdivision (d) firearm enhancement applied by its own terms to " 'any person' who, 'in the commission of' a specified felony, 'personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to *any person other than an accomplice*.' (Italics added.)" (*Oates, supra*, 32 Cal.4th at p. 1055.)

"Had the Legislature wanted to limit the number of subdivision (d) enhancements imposed to the number of injuries inflicted, or had it not wanted subdivision (d) to serve as the enhancement applicable to each qualifying conviction where there is only one qualifying injury, it could have said so." (*Id*. at p. 1056.)

### 5.    The Custody Credits

At the sentencing hearing, the court awarded defendant 1,095 actual days of presentence custody credits, acknowledging counsel's comment that the calculation could be inaccurate. The abstract of judgment however reflects an award of custody credits in the amount of 1,460 days. As the parties agree, the correct number of presentence custody credits is 1,457, reflecting defendant's actual days in custody from the date of his arrest on July 13, 2018, through the July 8, 2022 sentencing. On remand, the superior court shall correct the abstract of judgment to reflect 1,457 actual days of presentence custody credits.

### DISPOSITION

The case is remanded with directions to the superior court to award 1,457 actual days of presentence custody credits and to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation. The judgment of conviction is affirmed in all other respects.


GRIMES, Acting P. J.

WE CONCUR:


WILEY, J.     VIRAMONTES, J.

20